United States District Court
Southern District of Texas
**ENTERED**
May 28, 2024
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ODALIS HERNANDEZ DE ALFARO and JUANA MOLINA, | § § § § | |
| Plaintiffs, | § § | CIVIL ACTION NO. H-22-2619 |
| v. | § § | |
| PANTHER II TRANSPORTATION, INC., et al., | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

This case arises from a March 2022 vehicle accident on a major freeway near Houston, Texas.  A semi-truck trailer driven by Brian Keith Moorer and owned by Panther II Transportation, Inc. (the "defendants") struck a truck driven by Odalis Hernandez De Alfaro, with Juana Molina Mejia (the "plaintiffs") in the passenger seat.  The defendants have filed two separate motions to "strike, exclude, or limit" expert opinions supporting Mejia's damages claim.  One motion seeks to exclude the opinions of Dr. Stan V. Smith.  (Docket Entry No. 37).  The other motion seeks to exclude a life-care plan prepared by Dr. Christopher R. Sellars and a present-value assessment prepared by William L. Davenport.  (Docket Entry No. 39).

The motion to exclude Dr. Smith is granted in part and denied in part.  (Docket Entry No. 37).  The motion to exclude the life-care plan and present-value assessment is granted in full. (Docket Entry No. 39).  The reasons are set out below.

**I.      The Legal Standards**

Under Federal Rule of Evidence 702, a witness may provide expert opinion testimony if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods of the facts to the case.

FED. R. EVID. 702; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provides the framework for analyzing whether, when, and to what extent expert testimony is admissible under Rule 702. "In *Daubert*, the Supreme Court 'explained that Rule 702 assigns to the district judge a gatekeeping role to ensure that scientific testimony is both reliable and relevant.'" *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012) (per curiam) (quoting *Curtis v. M & S Petro., Inc.*, 174 F.3d 661, 668 (5th Cir. 1999)). The party offering the expert opinion must establish admissibility by a preponderance of the evidence. *Sims v. Kia Motors of Am., Inc.*, 839 F.3d 393, 400 (5th Cir. 2016); *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 385 (5th Cir. 2009).

To be relevant, expert testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." *Weiser–Brown Operating Co. v. St. Paul Surplus Lines Ins. Co.*, 801 F.3d 512, 529 (5th Cir. 2015) (quotation omitted). Reliability, a separate requirement, concerns "whether the reasoning or methodology underlying the testimony is scientifically valid." *Carlson v. Bioremedi Therapeutic Sys.*, 822 F.3d 194, 199 (5th Cir. 2016) (quoting *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 233–44 (5th Cir. 2002)). To be reliable, expert testimony must "be grounded in the methods and procedures of [the applicable] science and be more than unsupported speculation or subjective belief." *Arkema*, 685 F.3d at 459 (quotation and alteration omitted); *see*

2

*also Huss v. Gayden*, 571 F.3d 442, 460 (5th Cir. 2009) ("Courts must be arbiters of truth, not junk science and guesswork."). To establish reliability, an expert must furnish "some objective, independent validation of [his] methodology." *Brown v. Ill. Cent. R.R. Co.*, 705 F.3d 531, 536 (5th Cir. 2013) (quotation omitted) (alteration in original). "The expert's assurance that he has utilized generally accepted [principles] is insufficient." *Id.* (quotation omitted) (alteration in original); *see also Kumho Tire*, 526 U.S. at 157, 119 S.Ct. 1167 (the court is not required to "admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert" (quotation omitted)). It is the trial court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. The court must evaluate "whether the expert is a hired gun or a person whose opinion in the courtroom will withstand the same scrutiny that it would among his professional peers." *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 991 (5th Cir. 1997)

"[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. "[T]he basis of an expert's opinion usually goes to the weight, not the admissibility, of the testimony." *Fair v. Allen*, 669 F.3d 601, 607 (5th Cir. 2012). Occasionally, "the source upon which an expert's opinion relies is of such little weight that the jury should not be permitted to receive that opinion." *Id.* "Expert opinion testimony falls in this category when that testimony would not actually assist the jury in arriving at an intelligent and sound verdict." *Id.* "Cross-examination at trial, however, is the proper forum for discrediting testimony, and credibility determinations are, of course, the province of the jury." *Dearmond v. Wal–Mart La. LLC*, 335 F. App'x 442, 444 (5th Cir. 2009); *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562–63 (5th Cir.

2004); *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cty., Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996).

A district court has discretion in determining the admissibility of expert testimony under Rule 702, *Daubert*, and subsequent cases. Under Rule 702 and *Daubert*, the district court "has broad discretion to determine whether a body of evidence relied upon by an expert is sufficient to support that expert's opinion." *Arkema,* 685 F.3d at 458–459 (quoting *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 354 (5th Cir. 2007)); *see also Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167 ("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.").

## II.     The Motion to Exclude Dr. Smith's Report and Testimony

Dr. Stan V. Smith's expert report contains calculations of Mejia's damages, including: (1) lost wages and employment benefits; (2) loss of household services; and (3) loss of the value of life. (Docket Entry No. 38 at 29).  The defendants argue that each calculation is inadmissible under Federal Rule of Evidence 702.  (Docket Entry No. 37).  Mejia's response to the motion to exclude states that she "voluntarily withdraws Dr. Smith's opinions on the loss of enjoyment of life." (Docket Entry No. 42 at 6).  Accordingly, the court addresses only the defendants' challenges to Dr. Smith's other damages calculations.

### A.     Lost Wages and Employment Benefits

Dr. Smith estimates that Mejia's lost wages due to the automobile accident are $1,430,525. (Docket Entry No. 38 at 32).  Dr. Smith calculated this figure by subtracting an estimate of Mejia's future wages (the "earnings offset") from an estimate of her future wages had she not been injured. (*Id.*).  The defendants challenge Dr. Smith's calculation on the grounds that it is based on insufficient evidence and on a flawed earnings offset.  (Docket Entry No. 37 at 25–26).

4

Dr. Smith's calculation of Mejia's lost wages is based on Mejia's answers to interview questions posed by Dr. Smith's employee.  In that interview, Mejia stated that she was fired from her job as a cook "because the limitations placed on her by the injury were too much."  (Docket Entry No. 38 at 106).  Mejia testified in her deposition that she was not fired, but instead quit her job.  (*Id.* at 128).  The defendants argue that Dr. Smith's lost-wages opinion should be excluded because it is based on Mejia's impeachable interview answers.  This argument is unpersuasive because Mejia's physical limits after the accident made it hard to do her job, making whether she quit or was fired irrelevant to Dr. Smith's lost-wages calculation.  Mejia's contradictory discovery responses on this issue do not make Dr. Smith's expert opinion inadmissible.

The defendants also argue that Dr. Smith's lost-wages calculation should be excluded because his earnings offset is flawed.  Specifically, the defendants argue that Dr. Smith's earnings offset (1) wrongly assumes that Mejia is disabled and (2) is not supported by his own data.  (Docket Entry No. 37 at 26).

In his deposition, Dr. Smith testified that he had no opinion "as to whether [Mejia is] disabled or not because that would require a medical determination."  (Docket Entry No. 38 at 23).  The defendants argue that because of this assumption, Dr. Smith's lost-wages calculation "will be useless to the jury if Mejia does not have the exact type of disability Smith has assumed."  (Docket Entry No. 37 at 26).  The court is unpersuaded that Dr. Smith's assumption that Mejia has a disability makes his lost-wages calculation inadmissible at this stage.  If there is insufficient evidence of the nature and extent of Mejia's disability at trial, Dr. Smith's lost-wages opinion may be excluded, and the jury may be directed to disregard any prior testimony about it.

The defendants also argue that Dr. Smith has not "proven that his offset calculations reliably calculate the amount of money that Mejia will make post-injury."  (Docket Entry No. 37

5

at 27).  Dr. Smith estimated Mejia's post-injury wages by combining two statistics: the probability of lower wages and the probability of lower employment for people with a disability involving difficulty walking.  (Docket Entry No. 38 at 33).  The defendants contend that Dr. Smith "does not explain whether this approach is generally accepted, can or has been tested, or has been subject to peer review."  (Docket Entry No. 37 at 27).  This challenge is unpersuasive.  These two factors— statistically lower wages and lower probability of employment for individuals with disabilities involving difficulty walking—are relevant in calculating Mejia's lost-earning capacity, if she has a disability that makes walking difficult, a question the factfinder will determine.

Dr. Smith opines that Mejia's damages for lost-employment benefits is $82,201.  (Docket Entry No. 38 at 53).  Dr. Smith's calculation of Mejia's lost-employment benefits is based on an assumption that an employer would pay Mejia "6.2 percent of wages based on Social Security benefits."  (*Id.* at 24, 32).  Dr. Smith did not factor in health insurance, retirement plans, or "any other employee benefits" because Mejia had not received these benefits from her employer at the time of her injury.  (*Id.*).  To calculate social security benefits, Dr. Smith relied on data from the U.S. Department of Labor, Bureau of Labor Statistics.  (*Id.*).

The defendants challenge Dr. Smith's lost-employment benefits calculation on the ground that Dr. Smith "has no data and has presented no opinion that Mejia's employers ever did or would have contributed to social security.  Mejia testified that she does not have a social security number or a green card or any other legal authorization to work in the United States."  (Docket Entry No. 37 at 28).  The defendants are correct that Mejia, as long as she is an unlawfully present alien, is not entitled to social security benefits.  *Texas v. United States*, 809 F.3d 134, 148 (5th Cir. 2015), *as revised* (Nov. 25, 2015).  However, Mejia is entitled to put on evidence that she is, or would

6

become, entitled to social security benefits.  If she fails to produce any evidence, Dr. Smith's lost benefits calculation may be excluded and the jury may be instructed to disregard it.

Finally, the defendants challenge Dr. Smith's assumption that Mejia would pay income taxes at a rate of 10%.  (Docket Entry No. 37 at 28–29).  The defendants argue that Dr. Smith's opinion disregards the evidence that Mejia had not paid income taxes in the past.  (*Id.*).  This objection is overruled.  It is reasonable to assume, for purposes of calculating lost wages, that Mejia would pay income taxes.  Section 18.091 of the Texas Civil Practice and Remedies Code presumes that any award for loss of earnings or loss of earning capacity will be subject to "reduction for income tax payments."  It accordingly requires that "evidence to prove the loss must be presented in the form of a net loss" after taxes.  *Id.*

### B.    Loss of Household Services

Dr. Smith opines that the value of household services that Mejia lost due to her injury is $105,655.  (Docket Entry No. 38 at 36).  Dr. Smith's calculation is partly based on an estimate that Mejia lost 15 percent of her pre-injury capacity (Mejia's "impairment rating") to conduct "housekeeping and household management services."  (*Id.* at 34).  Dr. Smith bases this impairment rating on Mejia's answers to certain interview questions.  (*Id.*).

The defendants argue that Dr. Smith "has not shown that his approach is a reliable method of determining Mejia's impairment rating" and "does not explain how or why he arrived at a 15 percent impairment rating based on the given percentages in the interview."  (Docket Entry No. 37 at 30).

The court is persuaded by the defendants' argument.  The court cannot determine whether Dr. Smith's method of determining Mejia's impairment rating is reliable because the only explanation Dr. Smith provides for the impairment rating is: "Ms. Mejia has difficulty in

performing housekeeping and household management services.  I illustrate the loss at 15 percent based on the interview."  (Docket Entry No. 38 at 34).  Dr. Smith does not explain how he arrived at 15 percent.

The notes from Mejia's interview with Dr. Smith's firm do little to illuminate Dr. Smith's methodology.  The notes pertaining to Mejia's reduced capacity for household chores state: "He [*sic*] declares that ten percent of his previous chores are now impossible, that he can do fifteen percent but 50 percent slower, and that the remaining 75 percent of chores are unaffected."  (*Id.* at 112–13).  Putting aside the confusing nature of these estimates,[1] Mejia has not identified which specific chores are "impossible" or "slower" or the amount of time and energy she now needs to perform different chores as opposed to before the accident.  This is the type of data on which "experts in the particular field would reasonably rely."  FED. R. EVID. 703.  Dr. Smith relies on a single textbook to support his methodology of using "an informational interview to obtain the 'percentage diminution that the injured party can no longer perform,'" (Docket Entry No. 38 at 34).  However, he provides no explanation or support for the specific method he used to derive an impairment rating from Mejia's interview answers.

Dr. Smith's opinion on Mejia's loss of household services is excluded.

## III.   The Motion to Exclude the Life-Care Plan and Present-Value Assessment

Dr. Christopher R. Sellars prepared a life-care plan[2] for Mejia that estimated "[t]he total nominal value of [her] future medical requirements" as $926,796.50.  (Docket Entry No. 43-1 at

---

[1]  The chores Mejia says she can still do add up to 100%—75% being unaffected and 15% being slower. Yet Mejia says 10% of the chores she could previously do are now impossible.  Perhaps Mejia means that, of the chores she can still do, 75% are unaffected and 10% are slower.  Assuming that is the case, it remains unclear how Dr. Smith arrived at a 15% impairment rating.

[2]  Dr. Sellars defines life-care planning as "a process of applying objective methodological analysis to formulate diagnostic conclusions and opinions regarding physical and/or mental impairment and disability for the purpose of determining care requirements for individuals with permanent or chronic medical conditions."  (Docket Entry No. 43-1 at 14).  He defines "life care plans" as "comprehensive documents

14).  The defendants move to exclude the life-care plan on the grounds that: (1) the methodology Dr. Sellars used to prepare it has not been peer reviewed; (2) the life-care plan is based on insufficient evidence; (3) Dr. Sellars fails to explain the basis for his opinions about Mejia's future medical needs; and (4) Dr. Sellars has not proven that Mejia's damages and future medical needs were caused by the accident.  (Docket Entry No. 39).  The defendants also move to exclude a present-value assessment prepared by Mr. Davenport.  (*Id.*).  The court addresses each argument in turn.

### A.      The Life-Care Plan

#### i.      Peer Review

A "pertinent consideration" in analyzing the admissibility of expert evidence is "whether the [expert's] theory or technique has been subjected to peer review and publication."  *Daubert*, 509 U.S. at 593.  "[S]ubmission to the scrutiny of the scientific community is a component of 'good science,' in part because it increases the likelihood that substantive flaws in methodology will be detected."  *Id.*  However, peer review and publication are not dispositive.  *Id.*

The defendants argue that the life-care plan Dr. Sellars prepared was not reviewed by anyone other than Dr. Sellars and was not independently peer reviewed.  They also argue that Dr. Sellars failed to consult with Mejia's treating physicians or ask them to review the plan to see if the treatment was consistent with Mejias's prognosis.  (Docket Entry No. 39 at 13–14).

The defendants' argument appears to conflate peer review of Dr. Sellars's methodology in designing the life-care plan with peer review of the life-care plan itself.  The relevant issue is whether the methodology Dr. Sellars used to prepare the life-care plan has been peer reviewed, not

---

that objectively identify the residual medical conditions and ongoing care requirements of ill/injured individuals, and they quantify the costs of supplying these individuals with requisite, medically related goods and services throughout probable durations of care."  (*Id.* at 15).

whether the life-care plan has been reviewed by treating physicians and other experts.  Dr. Sellars's report and deposition testimony provide ample evidence that the methodology he used to prepare the life-care plan has been subjected to sufficient peer review.  (Docket Entry No. 43-1 at 15–16, 177–80).

### ii.    Sufficiency of the Evidence

The defendants argue that the opinions in Dr. Sellars's life-care plan are based on "insufficient information."  (Docket Entry No. 39 at 14).  The defendants make four arguments in support, which the court addresses in turn.

First, the defendants argue that Dr. Sellars "is not Mejia's doctor and has never provided her with any medical care," and never "ordered any diagnostic tests."  (*Id.*).  This is true, but there is no requirement that an expert preparing a life-care plan for a plaintiff must provide medical care to that patient.

Second, the defendants argue that Dr. Sellars relied on an "incomplete set of Mejia's medical records and a single video interview" with Mejia.  (*Id.*).  The defendants contend that the video interview Dr. Sellars conducted prevented him "from performing any manual muscle testing, palpation, reflexes, sensory testing, or pulse checks." (*Id.*).  The defendants do not identify which medical records Dr. Sellars failed to consider, or how his failure to consider those medical records makes the life-care plan inadmissible.  Dr. Sellars's report shows that he relied on numerous medical records from several of Mejia's visits to health care providers.  (Docket Entry No. 43-1 at 20–30).  His report also reflects that his video interview was detailed and provided such relevant information as the level of Mejia's physical pain from her various injuries, her physical and cognitive function, emotional state, symptoms, medical history, and medications.  (*Id.* at 31–38). The defendants' objection is overruled.

Third, the defendants argue for exclusion because Dr. Sellars "did not contact or consult with any of Mejia's treating providers." (Docket Entry No. 39 at 14). This objection is overruled because "there is no requirement that an expert life-care planner consult with treating physicians or independent medical doctors before formulating a life-care plan." *Fuselier v. Everest Nat'l Ins. Co.*, 2021 WL 3179810, at *2 (W.D. La. July 26, 2021); *see also Hegwood v. Ross Stores, Inc.*, 2007 WL 9711993, at *4 (N.D. Tex. Jan. 17, 2007) (agreeing that "life care planners . . . are not required to review their assessment of future medical needs with a physician").

Fourth, the defendants argue for exclusion on the ground that Dr. Sellars "directly contradicts his own findings within the report as well as Mejia's medical records." (Docket Entry No. 39 at 16). The defendants note that Dr. Sellars's report states in one section that Mejia "is currently able to perform the same types of work-related tasks for the same amount of time as she was prior to her injury," and in another section that she is unable to perform many basic daily tasks. (Docket Entry No. 43-1 at 35, 40). However, the defendants do not explain how this apparent contradiction makes Dr. Sellars's opinions inadmissible. Absent a contradiction exposing a fundamental flaw in Dr. Sellars's methodology or application of methodology to the facts, this issue goes to the weight of the evidence, not its admissibility.

### iii.    Failure to Explain

The defendants argue for exclusion of the life-care plan on the ground that Dr "Sellars' report simply sets forth recommendations without explaining the basis for his opinions. Specifically, Sellars does not explain how he determines what services are necessary, what data he relies on, and how he determines the duration and frequency of each treatment." (Docket Entry No. 39 at 16–17). The defendants argue that Dr. "Sellars' projected treatments are not supported by Plaintiff's treating medical doctor's opinions." (*Id.* at 19). The defendants rely on *Queen v.*

*W.I.C., Inc.*, 2017 WL 3872180 (S.D. Ill. Sept. 5, 2017), in which the court excluded a life-care planner's recommendations because they were not supported by the plaintiff's medical records or recommended by treating physicians.  The court held that the planner was unqualified to make the recommendations independently, and the planner did not explain what method he used to make his recommendations.  *Id.* at *5.

The court is persuaded that Dr. Sellars fails to adequately explain the basis for his recommendations for life-long therapy, testing, and medication.  As the defendants note, the life-long care Dr. Sellars recommends is extensive, including:

> physical medicine & rehabilitation/pain management four times yearly for the first ten years, then three times yearly for the next thirty-four years, psychiatrist, MRI brain scans five times yearly for thirty-nine years, X-Rays and MRIs of the cervical spine, shoulder, lumbar spine, knee, foot/ankle for forty-four years, daily dose of Tylenol, NSAID, an over the counter topical analgesic, and a prescription analgesic for forty-four years, yearly lab tests, physical therapy evaluations and physical therapy sessions for forty-four years, as well as various equipment and supplies.

(Docket Entry No. 39 at 19–20).  Additionally, Dr. Sellars opines that Mejia will need to take an antidepressant for the rest of her life, costing $336,331.68.

Dr. Sellars states that he relied on Mejia's medical records and his video interview with Mejia to formulate these conclusions.  However, he does not bridge the analytical gap between this data and his conclusions about Mejia's future medical requirements.  *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.").  He does not explain how he reached the conclusion that the specific therapies, testing, and medication set out in the plan are required, much less that they will be required for the remainder of Mejia's life.  Moreover, Dr. Sellars has not demonstrated that he is qualified to opine that Mejia must take an antidepressant

for the remainder of her life, a recommendation that has not been made by Mejia's treating physicians. Dr. Sellars is a physical medicine and rehabilitation specialist, not a psychiatrist. (Docket Entry No. 43 at 20). *See Queen*, 2017 WL 3872180, at *5 ("[P]laintiff fails to demonstrate how [the life-care planner] meets any standard for psychiatrists to offer these opinions that far exceed the recommendations of plaintiff's treating physicians.").

Because Dr. Sellars's opinions about Mejia's future medical needs are not supported by any explained methodology, Mejia's medical records, the recommendations of her treating physicians, or Dr. Sellars's own expertise, they are excluded.

###### iv.    Causation

The defendants challenge Dr. Sellars's opinions on the ground that he has not "proven" that Mejia's damages and future medical care were caused by the accident. (Docket Entry No. 39 at 17). This objection is sustained to the extent that Dr. Sellars plans to offer an opinion that Mejia's conditions, and required treatments, were caused by the automobile accident. Dr. Sellars has not demonstrated that he used a reliable methodology, and reliably applied that methodology to the facts, to determine causation. Rather, he states only that he considers "all future medical requirements in this Life Care Plan[] . . . specifically attributable to the medical conditions which resulted from [] Mejia's motor vehicle accident." (Docket Entry No. 43-1 at 18). Dr. Sellars's conclusory explanation of the causal link between the accident and Mejia's injuries is inadmissible. *See Joiner*, 522 U.S. at 146.

##### B.    The Present-Value Assessment

Mr. Davenport prepared a present value assessment of Dr. Sellars's life care plan. (Docket Entry No. 43-1 at 191). The defendants move to exclude the present-value assessment on the

ground that it "is based on the unsupported, nominal costs determined in the life care plan." (Docket Entry No. 39 at 20).

The defendants' objection is sustained. Because Dr. Sellars's opinions about Mejia's future medical needs are inadmissible, Mr. Davenport's opinions about the present value of those medical needs are irrelevant, and also inadmissible. The present-value assessment is excluded.

## IV.   Conclusion

The motion to exclude Mr. Smith is granted only as to his opinion about Mejia's loss of household services. (Docket Entry No. 37). The motion to exclude the life-care plan and present-value assessment is granted in full. (Docket Entry No. 39).

SIGNED on May 24, 2024, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge